# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

CIVIL ACTION NO. 08-216-DLB

ROBERT FRENCH                                                    PLAINTIFF

vs.                    <u>MEMORANDUM OPINION AND ORDER</u>

BP CORPORATION NORTH AMERICA, INC., and
BP RETIREMENT ACCUMULATION PLAN, INC.                    DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Robert French commenced this action against his former employer Defendant BP Corporation North America, Inc. ("BP") and its pension plan alleging violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Plaintiff filed this lawsuit as a class action on behalf of himself and those similarly situated. Specifically, Plaintiff alleges BP unlawfully reduced his previously accrued benefits in the following two ways: (1) BP applied an interest rate that exceeded statutory maximum rates permitted under ERISA § 205(g)(3)(A), 29 U.S.C. § 1055(g)(3)(A),[1] and the Internal Revenue Code ("IRC") § 417(e)(3) when calculating the lump-sum present value of Plaintiff's previously accrued benefit for purposes of establishing his opening account balance; and (2) by establishing his opening account balance retroactively, BP eliminated prior accrued benefits in violation of ERISA's anti-forfeiture and anti-cutback provisions. 29 U.S.C. §§ 1053(a), 1054(g). The first of Plaintiff's challenges

---

[1]This section of ERISA provides that the present value of a distribution "shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate." 29 U.S.C. § 1055(g)(3)(A). The applicable interest rate is the same as that articulated under IRC § 417(e)(3).

is the only issue currently before this Court.  The Court must decide whether use of an interest rate greater than § 417(e)(3)'s rate to calculate participants' opening account balances results in an impermissible decrease of previously accrued benefits in violation of ERISA's anti-cutback provision.  26 U.S.C. § 1054(g).  The issue is one of first impression before this Court.

At a preliminary pretrial conference in November 2009, Plaintiff requested, and this Court granted, a period of discovery on Count I.  Parties were given until January 29, 2010 to file any cross-motions for partial summary judgment.  This matter is presently before the Court on the parties' cross-motions for partial summary judgment on Count I of the Complaint.  (Docs. # 37, 38).  The motions have been fully briefed (Docs. #39, 42, 43, 47, 48).  Oral argument was held on May 25, 2010, and the matter is now ripe for review.  For the reasons set forth below, because ERISA did not prescribe a specific statutory discount rate to calculate opening account balances at the time of BP's plan conversion, and BP's cash balance plan having provided that all prior accrued benefits would be preserved, Defendants' Motion for Summary Judgment as to Count I (Doc. #38) is **GRANTED**, and Plaintiff's Motion for Summary Judgment as to Count I (Doc. #37) is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff French

Plaintiff Robert French is a resident of Verona, Boone County, Kentucky.  Plaintiff worked as an hourly employee at BP's Filon Silmar plant in Fort Wright, Kentucky, from March 1988 until October 1991.  In October 1991, Plaintiff was laid off from the Filon Silmar

plant, but resumed working for BP in January 1992. Plaintiff continued to work for BP at various locations and in different capacities until August 27, 2007.

Effective January 1, 1989, BP converted its traditional defined benefit plan ("Prior Plan") to a cash balance plan, named the Retirement Accumulation Plan ("BP Plan").[2] Defendant BP is the plan sponsor of the BP Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). After working at BP for six months, Plaintiff was eligible to participate in BP's pension plan. From approximately October 1, 1988, until December 31, 1989, Plaintiff accrued .250 years of service under the Prior Plan, which was expressed as an accrued benefit once BP converted to its cash balance plan. On March 2, 1989, the hourly workforce at Plaintiff's location unionized. From November 17, 1989, until December 31, 1990, Plaintiff accrued a benefit that was provided under the BP America Master Hourly Plan for Represented Employees. In November 1990, the union was decertified, and Plaintiff was converted to the cash balance formula under the BP Plan on or about January 1, 1991. Consistent with conversion, the assets and liabilities with respect to any benefit Plaintiff accrued under the Master Hourly Plan were transferred to the cash balance plan.

## B.    Background on Cash Balance Plans

A cash balance plan is a type of pension plan "intended to combine attributes of both defined contribution and defined benefit plans." *Hirt v. Equitable Ret. Plan*, 533 F.3d 102, 105 (2d Cir. 2008). In contrast to a traditional defined benefit plan that consists of a

_____

[2]BP's defined benefit plan provided benefits under a "final average pay" formula, which is often referred to as a final average pay plan. A final average pay plan provides a pension benefit, expressed as a monthly or yearly payment, using a formula based on years of service, average pay over a specified period, and a multiplier (e.g., 1.5 times years of services multiplied by the average of the highest three years of earning). Unlike a final average pay plan, a cash balance plan participant who terminates employment before normal retirement age may also take a distribution of his account based on the value of his account estimated to normal retirement, which is then discounted back to present value.

general pool of assets to be paid out in fixed periodic payments upon retirement, a cash balance plan allows participants to accrue benefits in the form of a hypothetical account derived from interest and pay credits. *Id.* (citing *Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir. 2000)). Interest credits are awarded based on a rate specified in the plan and are generally guaranteed at either a fixed or variable rate linked to an extrinsic index such as a Treasury bill rate. *Esden*, 229 F.3d at 158. Pay credits are the employer's hypothetical contributions awarded to individual employees usually expressed in the form of a salary percentage based on years of experience. *Id.*

"Thus, cash balance plans are often described as "hybrid": they create a benefit structure that simulates that of defined contribution plans, but employers do not deposit funds in actual individual accounts, and employers, not employees, bear the market risks." *Hirt*, 533 F.3d at 105 (citation omitted). Despite any resemblance it might bear to a defined contribution plan, a cash balance plan is considered a defined benefit plan for purposes of ERISA because the individual accounts and contributions under the plan exist merely for purposes of record keeping, and "[c]ash balance plans guarantee participants a defined benefit, determined by a formula, at retirement." *Hurlic v. S. Cal. Gas. Co.*, 539 F.3d 1024, 1029 (9th Cir. 2008).

Classifying cash balance plans as defined benefit plans reaps profound "regulatory consequences." *Esden*, 229 F.3d at 158. Most notably, an "accrued benefit" under a defined contribution plan is defined simply as the "balance of the individual's account," ERISA § 3(23)(B); IRC § 411(a)(7)(A)(ii), while under a defined benefit plan an accrued benefit amounts to "the individual's accrued benefit determined under the plan and...expressed in the form of an annual benefit commencing at normal retirement age."

4

29 U.S.C. § 1002(23)(A). Unlike defined contribution plans, moreover, defined benefit plans are not exempted from the statutory constraints detailed in several parallel provisions of ERISA and the IRC. The most relevant restriction that confines defined benefit plans, for purposes of this case, is the valuation rules under IRC § 417(e) as applicable through IRC § 411(a)(11)(B). The governing statutes and regulations undoubtedly were enacted to regulate the features of traditional defined benefit plans, without regard to the unique challenges presented by conversion from a final pay formula to a cash balance formula. Consequently, conversion and subsequent compliance with ERISA can "sometimes require outcomes that are in tension with the objectives of [cash balance] plans." *Esden*, 229 F.3d at 159.

In 2006, Congress enacted the Pension Protection Act ("PPA"), Pub. L. No. 109-280, 120 Stat. 780 (2006), in part to "address the treatment of cash balance plans under the ERISA statutory scheme." *West v. AK Steel Corp.*, 484 F.3d 395, 401 (6th Cir. 2007). The PPA, in essence, amended ERISA to address some of the "loopholes" that previously existed when applying rules created for defined benefit plans to cash balance plans. One such amendment now requires that after plan conversion, the benefit under the new plan can be no less than the sum of the accrued benefit determined under the terms of the old plan *plus* the accrued benefit after amendment as determined by the new plan, which may have implications for the creation of opening account balances. 29 U.S.C. § 1054(b)(5)(B)(iii); *see also Sunder v. U.S. Bancorp Pension Plan*, 586 F.3d 593, 600 n.8 (8th Cir. 2009). Despite the PPA's relevance to cash balance conversions, its amendments are enforced on a prospective basis only and, thus, apply to periods beginning on or after

June 29, 2005 and distributions made after August 17, 2006. PPA § 701(e)(1) & (2); *see also West*, 484 F.3d at 411-12.

### C.    Plaintiff's Opening Account Balance Under BP's Cash Balance Plan

On January 1, 1991, an opening account balance was established for Plaintiff, which represented the "value of benefits accrued under the Prior Plan through December 31, 1988, pursuant to Appendix B-2 of the Plan." (Doc. #37, Ex. 3, at 19). In other words, according to the BP Plan, Plaintiff's opening account balance represented the lump-sum present value of the retirement annuity he earned under the prior benefit formula at the time of conversion. Appendix B provided the discount rate used to calculate Plaintiff's opening account balance was 8%, and his account was established on January 1, 1991, retroactive to January 1, 1989. Plaintiff received notification that his opening account balance for January 1, 1989, was $44 and that $23 represented the value of his accrued benefit under the Prior Plan, and the remaining $21 represented the value of his early retirement subsidy earned under the Prior Plan.

### D.    Calculating Lump-sum Distributions and Opening Account Balances

Because an accrued benefit under a defined benefit plan is expressed in the form of an annuity beginning at normal retirement age, when a participant elects to receive his retirement benefit prior to normal retirement age, ERISA requires that the lump-sum distribution "be the actuarial equivalent of the normal accrued pension benefit." *West*, 484 F.3d at 400 (citing 29 U.S.C. § 1054(c)(3)). Determining the actuarial equivalent is a two step process commonly referred to as the "whipsaw" calculation:[3] (1) the participant's

---

[3]After passage of the PPA in 2006, a whipsaw calculation is no longer required to calculate lump-sum distributions. *West*, 484 F.3d at 402.

hypothetical account balance is projected forward to normal retirement age, which is usually 65, using the rate of future interest credits that would have accrued under the plan if the participant had participated in the plan until that time, at which point (2) the account is discounted back to its present value to the date of the actual lump-sum distribution using the IRC's statutory discount rate set forth in § 417(e)(3). 26 U.S.C. § 417(e)(3); *see West*, 484 F.3d at 400. For purposes of the whipsaw calculation, the lower the discount rate, the larger the resulting lump-sum distribution. The whipsaw calculation has often been used by plans to avoid violating ERISA's non-forfeiture provisions. "If the plan's projection rate exceeds the statutory discount rate, then the present value of the accrued benefit will exceed the participant's [cash] account balance," *Esden*, 229 F.3d at 159, and the higher of either the cash balance or the amount resulting from the whipsaw calculation must be paid.[4]

In seeking to have a participant's opening account balance "reflect the value of benefits accrued under the Prior Plan," BP used a calculation that mimics the whipsaw calculation to determine the prior accrued benefit's present value. However, to establish Plaintiff's opening account balance, BP used a discount rate of 8% as set forth in the plan, rather than the statutory discount rate set forth in IRC § 417(e)(3). BP Plan § 3.3, Appendix B.

E.     Important BP Plan Provisions

In addition to its use of an 8% discount rate to set opening account balances, the BP Plan provided in a section titled "No Reduction in Prior Plan Accrued Benefit" that "[i]n no

---

[4]Amendments to the PPA now allow plan administrators, in part, to deem present value of an accrued benefit equal to that of the participant's cash balance in his hypothetical account without violating ERISA; therefore, the whipsaw calculation is no longer necessary as discussed in n.3, *supra*.

event shall the benefits payable under this Plan to a Participant who was a participant under the Prior Plan be less than the Actuarial Equivalent of the benefit such Participant would have received under the Prior Plan." BP Plan § 6.8. Defendants contend this plan provision ensures compliance with ERISA § 204(g), and preserves the entirety of Plaintiff's accrued benefit under the Prior Plan.

The cash balance plan also contained the following provisions, which Defendants assert were included in an effort to further protect participants' accrued benefits: the BP Plan (1) provided that all participants over the age of 50 would be "grandfathered," meaning they could continue to accrue benefits under both the prior plan's methodology as well as the cash balance formula on a prospective basis, § 3.6 BP Plan; (2) calculated the value of each participant's benefit under the Prior Plan based on certain actuarial factors specified in the Plan and included that amount as an "opening account balance," § 3.3 BP Plan; and (3) enhanced the value of the opening account balance by including the value of not only normal-retirement-age benefits, but also the full value of early retirement subsidies. (Doc. #39, Ex. 16, at 6).

Despite plan language that prior accrued benefits shall not be reduced and additional provisions designed to protect his previously accrued benefit, Plaintiff alleges BP's plan conversion unlawfully reduced his previously accrued benefits under the Prior Plan. The issue the Court must decide is whether BP violated ERISA when it used an 8% discount rate–a rate higher than § 417(e)(3)'s statutory rate–to determine the present value of Plaintiff's previously accrued benefit for purposes of establishing his opening account balance under the cash balance plan.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce evidence showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

On cross-motions for summary judgment, the standard is the same as that for individual motions. *Taft v. Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Upon review of each motion, the "court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*; *see also Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004).

**B.      The Starting Point: *Sunder v. Bancorp* and Its Significance**

To date, only one district court has addressed the merits of whether use of a discount rate greater than the statutory rate set forth in § 417(e)(3) to calculate a plan participant's opening account balance after conversion to a cash balance plan causes an impermissible cutback of accrued benefits in violation of ERISA 204(g). *See Sunder v. U.S. Bank Pension Plan*, No. 4:05CV01153, 2007 WL 2811078 (E.D. Mo. Sept. 24, 2007). Commonly referred to as ERISA's anti-cutback provision, section 204(g) requires that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."  29 U.S.C. § 1054(g)(1).  In *Sunder*, Mercantile Bank sponsored a traditional defined benefit plan for its employees, which it converted to a cash balance plan ("USBP Plan")[5] on December 31, 1998. *Id.* at *3.  The plaintiffs terminated their employment with Mercantile Bank in 2000 and elected to receive their accrued pension benefits in the form of a lump-sum distribution. *Id.* at *2-3.  After receiving their distribution, the plaintiffs filed suit in federal court claiming the amount received was much lower than their actual entitlement.  Plaintiffs argued the USBP Plan violated ERISA when it used a discount rate greater than the discount rate articulated in § 417(e)(3) to calculate both the plaintiffs lump-sum distribution and their opening account balances after plan conversion. *Id.*

The district court ultimately held the use of that higher 8% rate violated ERISA's anti-cutback provision under ERISA § 204(g). *Id.* at *10.  Initially, however, the court granted summary judgment in favor of the USBP Plan, concluding that ERISA did not mandate a specific interest rate in setting a participant's opening account balance after conversion at

---

[5]Through a series of acquisitions, U.S. Bancorp became the successor to Mercantile Bank, and the plan name for the cash balance plan became the U.S. Bank Pension Plan ("USBP Plan").

the time of the Mercantile Plan conversion. *Sunder v. U.S. Bank Pension Plan*, No. 4:05CV01153, 2007 WL 541595 (E.D. Mo. Feb. 16, 2007). It was not until the *Sunder* plaintiffs petitioned the court to reconsider its grant of summary judgment during a bench trial on a separate issue (i.e. whether the USBP Plan used the correct interest rate in calculating lump-sum *distributions*), that the court reversed itself and held in favor of plaintiffs. *Sunder*, 2007 WL 2811078 at *10. The court held the USBP Plan's failure to use the § 417(e)(3) interest rate unlawfully reduced the plaintiffs' accrued benefits in violation of ERISA. *Id.* Thereafter, the district court ordered the defendant plan to recalculate the plaintiffs' opening account balances using § 417(e)(3) and credit the accounts with the difference and any interest earned from the date of conversion to the cash balance plan. *Id.*

On November 9, 2009, the Eighth Circuit reversed the district court. *Sunder v. U.S. Bancorp Pension Plan*, 586 F.3d 593 (8th Cir. 2009). The Eighth Circuit specifically concluded that "neither ERISA nor the terms of the plan precluded [the USBP Plan] from calculating the opening cash balances using the 8% discount rate." *Id.* at 600. Disagreeing that application of § 417(e)(3)'s interest rate was necessary to protect the plaintiffs' accrued benefit under the prior plan, the Eighth Circuit cited as determinative the lack of any ERISA provision addressing the creation of opening account balances–much less mandating a discount rate applicable to opening account balances–at the time of the Mercantile plan conversion. *Id.* In the absence of explicit statutory direction, the Eighth Circuit concluded the USBP Plan was free to set opening account balances in any manner it wished, provided the calculation did not decrease previously accrued benefits. *Id.* Because the USBP Plan protected previously accrued benefits as of December 31, 1998, "by guaranteeing that a

participant's final distribution in the Cash Balance Plan shall not be less than the accrued benefit under the Mercantile Plan,'" it avoided any violation of ERISA's anti-cutback provision. *Id.* (quotations omitted).

In further support of its decision, the Eighth Circuit observed that prior to enactment of the Pension Protection Act, courts consistently held that ERISA did not prevent wear-away[6] after plan conversion, nor did it prevent the inclusion of a wear-away provision within the terms of the plan amendment. Specifically, the Eighth Circuit cited *Hurlic*, 539 F.3d 1024, wherein the Ninth Circuit recognized a plan "clearly could have" frozen "all participants' pre-conversion benefits," as of the date of the plan conversion. *Sunder*, 586 F.3d at 601. The court also relied on the First Circuit's decision in *Campbell v. BankBoston, N.A.*, 327 F.3d 1 (1st Cir. 2003), which held that conversion from a defined benefit plan to a cash balance plan did not cause forfeiture of accrued benefits where a plaintiff alleged an ERISA violation based merely on "the elimination of future *expected* accruals of benefit."[7] *Id.* at 8.

The Eighth Circuit relied on the foregoing precedent to conclude "that a total freeze on benefits was tolerated as consistent with ERISA prior to the 2006 Pension Protection Act bolsters our conclusion that ERISA did not govern the setting of opening cash

---

[6]Wear-away prevents employees from accruing new benefits under a newly converted cash balance plan until the accruals in the cash balance account exceed the value of the benefits already accrued under the prior plan. Edward A. Zelinsky, The Cash Balance Controversy, 19 Va. Tax Rev. 683, 702-03 (2000). Effectively, a participant is left accruing benefits at a rate of 0% during the wear-away period. *Rosenblatt v. United Way of Greater Houston*, --- F.3d ---, 2010 WL 2015362, at *3 (5th Cir. 2010).

[7]The First Circuit concluded "[t]he December 31, 1996 amendment to the plan protected all of the pension benefit based on Campbell's work for the company up to that point; it merely ceased accruals under the old plan based on employment from that point forward. This was an elimination of an expected, not accrued, benefit. There was no ERISA violation." *Campbell*, 327 F.3d at 8-9.

balances, as long as a participant's previously accrued benefits were protected and not decreased." *Sunder*, 586 F.3d at 601. Additionally, the Eighth Circuit found persuasive defendants' reliance on the United States General Accounting Office's report from 2000 (the "GAO Report"), which states "current federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided the plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer." *Id.* (quoting the GAO Report).

The facts in this case are identical to those in *Sunder*. BP used an 8% interest rate–a rate greater than the statutory maximum set for distributions–to discount the lump-sum present value of French's accrued benefit under the existing defined benefit plan to establish his resulting opening account balance for conversion to its cash balance plan. As explained more fully herein, Plaintiff has failed to meaningfully distinguish *Sunder*, which the Court finds is persuasive on the issue to be decided by the Court. Use of an 8% discount rate to calculate Plaintiff's opening account balance when BP converted to a cash balance plan did not violate ERISA's anti-cutback provision.

## C. IRC § 417(e)(3) Applies Only to "Distributions" Not "Determinations"

Plaintiff attempts to argue that ERISA dictates use of the § 417(e)(3) discount rate because it applies to any valuation *determination* of a participant's accrued benefit. In other words, Plaintiff contends that any time a benefit is *reduced to a present value* the interest rate articulated in § 417(e)(3) must be applied and, therefore, should have been applied when calculating his opening account balance. Defendants respond that Plaintiff "freely and incorrectly conflates" the terms "determination" and "distribution" to bolster his argument, and further that § 417(e) only makes reference to "distributions" is indicative that

13

its application does not extend more generally to any present value determination. Defendants' argument is well-taken. Consistent with the plain meaning of the statute, the interest rate prescribed in § 417(e)(3) is one applicable *only* to distributions.

Section 417(e) articulates when a plan may "immediately *distribute*" the present value of an annuity. 26 U.S.C. § 417(e)(2) (1989) (emphasis added). The statute–in force in 1989, the year of BP's plan conversion–contained three subsections under § 417(e)'s heading "Restrictions on cash-outs": (1) Plan may require distribution if present value not in excess of $3,500; (2) Plan may distribute benefit in excess of $3,500 only with consent; and (3) Determination of present value. Subsections (1) and (2) refer specifically to distributions and articulate when consent is required before a plan makes an immediate distribution of a participant's benefit based on the present value of the annuity. 26 U.S.C. § 417(e)(3) (1989). Subsection (3) then prescribes the method for determining present value specifying,

> For purposes of paragraphs (1) and (2) , the present value shall be calculated –
> (I) by using an interest rate no greater than the applicable interest rate if the vested accrued benefit (using such rate) is not in excess of $25,000, and
> (ii) by using an interest rate no greater than 120 percent of the applicable interest rate if the vested accrued benefit exceeds $25,000 (as determined under clause (I)).

26 U.S.C. § 417(e)(3) (1989). The 1989 version of the statute further articulated that "applicable interest rate" means "the interest rate which would be used (as of the date of *distribution*) by the Pension Benefit Guaranty Corporation[8] for purposes of determining the

---

[8]The PBGC is an ERISA-created agency that insures minimum pension benefits for defined benefit plans if the employer becomes unable to pay the pension; there is no insurance for the defined contribution plan. *In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002, 1011 n.8 (S.D. Ohio 2006).

present value of a lump-sum *distribution* on plan termination."[9]  26 U.S.C. § 417(e)(3)(B)

(emphasis added).

The Court agrees with the Eighth Circuit's finding in *Sunder* that "[t]he context of the

statute demonstrates that § 417(e)(3) applies to distributions."  586 F.3d at 601.  The

structure and plain language of the statute reflect that the present value calculation

articulated should be applied when a participant "cashes-out" and receives a lump-sum

[9]By comparison, at the time of the Mercantile plan conversion in *Sunder*, as amended by the Retirement Protection Act of 1994, Section 417(e) provided:

(e) Restrictions on cash-outs

**(1) Plan may require distribution if present value not in excess of dollar amount.**  A plan may provide that the present value of a qualified joint and survivor annuity or a qualified preretirement survivor annuity will be immediately distributed if such value does not exceed the dollar limit under section 411(a)(11)(A).  No distribution may be made under the preceding sentence after the annuity starting date unless the participant and the spouse of the participant (or where the participant has died, the surviving spouse) consents in writing to such distribution.

**(2) Plan may distribute benefit in excess of dollar limit only with consent.** –if–
(A) the present value o f the qualified joint and survivor annuity or the qualified preretirement survivor annuity exceeds the dollar limit under section 411(a)(11)(A) and
(B) the participant and the spouse of the participant (or where the participant has died, the surviving spouse) consent in writing to the distribution, the plan may immediately distribute the present value of such annuity.

(**3**) **Determination of present value.** –
(A) In general. --
(I) Present value. – Except as provided in subparagraph (B), for purposes of paragraphs (1) and (2), the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate.
(ii) Definitions – For purposes of clause (I)--

\*   \*   \*   \*   \*   \*   \*

(II) Applicable interest rate. – The term "applicable interest rate" means the annual rate of interest on 30-year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe.

26 U.S.C. § 417(e) (1998).

This section has been further amended to provide, in relevant part, that the applicable interest rate means "the adjusted first, second, and third segment rates applied under rules similar to the rules of section 430(h)(2)(C) for the month before the date of the distribution or such other time as the Secretary may by regulations prescribe." 26 U.S.C. § 417(e)(3)(C), amended by the Pension Protection Act of 2006.  The amendments to this section only apply with respect to years beginning after December 31, 2007. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 207 n.7 (2d Cir. 2007).

*distribution* of his vested accrued benefit. No where does the statute make any reference to opening account balances, a point conceded by counsel at oral argument. Contrary to Plaintiff's assertion, the distribution formula established under § 417(e) is not applicable to just *any* lump-sum *valuation*.

In further support of his contention that § 417(e) should be interpreted broadly to encompass any lump-sum valuation, Plaintiff asserts that subsection (1) contemplates a situation where no lump-sum distribution takes place and as such applies to all present value calculations. Plaintiff's argument is ill-conceived. Subsection (1) provides,

> A plan may provide that the present value of a qualified joint and survivor annuity or a qualified preretirement survivor annuity will be immediately distributed if such value does not exceed $3,500. **No distribution may be made** under the preceding sentence after the annuity starting date unless the participant and the spouse of that participant (or where the participant has died, the surviving spouse) consents in writing to such distribution.

26 U.S.C. § 417(e)(1) (1988) (emphasis added). Presumably, Plaintiff is relying on the statutory phrase "[n]o distribution may be made" to make his argument. That the statute prohibits distribution after the annuity start date without consent from the participant and spouse, however, does not render the interpretation Plaintiff advocates.

The plain language of the statute indicates only that a distribution may not be made without the proper consent and, therefore, calculation of present value becomes moot for purposes of distribution. This Court refuses to build in a requirement wholly unrelated to and incongruous with the context of the statute.[10] Had Congress intended application of § 417(e)(3)'s interest rate to all lump-sum *valuations* regardless of distribution, the statute

---

[10]Interpreting a statutory provision of ERISA, the U.S. Supreme Court just this week reversed the Fourth Circuit's broad interpretation as "contrary to [the statute's] *plain text.*" *Hardt v. Reliance Standard Life Ins.*, 560 U.S. --- (2010) (emphasis added). Justice Thomas, writing for the majority, provided "[w]e must enforce plain and unambiguous statutory language according to its terms." *Id.* (citations omitted).

would have indicated as much.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 206-07 (2d Cir. 2007) (IRC § 417(e) only applies to lump-sum *distributions*).

### 1.    Preamble of Treasury Regulation § 1.417(e)-1 Does not Prescribe a Discount Rate for All Lump-sum Valuations

To support his argument that the methodology for calculating lump sums includes any valuation, regardless of distribution, Plaintiff directs this Court's attention to Treasury regulation § 1.417(e)-1 and its preamble.[11]  26 C.F.R. § 1.417(e)-1 (1989).  Specifically, Plaintiff points to the regulation's language, which requires use of the statutory interest rate "[f]or purposes of determining the present value of any accrued benefit and for purposes of determining the amount...of any distribution," arguing the regulation establishes dual purposes for the § 417 interest rate: (1) determining the lump sum amount actually paid to a participant; and (2) determining the present value of a participant's accrued benefit.  26 C.F.R. § 1.417(e)-1(d)(1).  Plaintiff's interpretation, however, impermissibly broadens the statute's application.  The regulation, in relevant part, provides:

> (d) Present value requirement–
> (1) For purposes of determining the present value of any accrued benefit and for purposes of determining the amount (subject to sections 411(c)(3) and 415) of any distribution including a single sum, a defined benefit plan is subject to the interest rate limitations described in subparagraph (2) of this paragraph (d) at the time set forth in subparagraph (3) of this paragraph (d).

29 C.F.R. § 1.417(e)-1.  A reading of this Treasury regulation that disposes with its statutory context–in other words, a reading that disregards the limitation of the present value calculation to distributions–is inappropriate.  Although the regulation does identify

---

[11]ERISA provides that Treasury regulations promulgated under IRC §§ 410(a), 411 and 412 are equally applicable to the parallel provisions of ERISA under sections 202 through 204.  *See* ERISA § 3002(c), 29 U.S.C. § 1202(c), 29 C.F.R. § 2530.200a-2 ("Regulations prescribed by the Secretary of the Treasury or his delegate under sections 410 and 411 of the Code (relating to minimum standards for participation and vesting) shall apply for purposes of sections 202 through 204 [of ERISA].").

dual purposes, both are tied to distributions: (1) determining first if a lump-sum distribution is permissible under § 417(e)(1); after which a plan administrator may (2) determine the value of the actual lump-sum distribution of the entire accrued benefit. Accordingly, § 417(e) applies to distributions and the Treasury regulation further interprets application of that statute to distributions.

The Eighth Circuit rejected this "dual purpose" argument when made by plaintiffs in *Sunder*. 586 F.3d at 602. Rejecting the argument that the regulation's use of the word "and" indicates § 417(e)(3)'s statutory rate applies either to a determination of a benefit's "present value" or to a determination of the amount for purposes of a distribution, the court concluded that use of the term "present value" was "conjunctive in nature." *Id.* Stated differently, "present value" was not to be read independent of "the amount of any distribution," without impermissibly expanding the statute's reach.

In further urging this Court to reject *Sunder's* analysis of Treasury regulation § 1.417(e)-1, Plaintiff contends the Eighth Circuit's reversal was based on an "erroneous analysis" of the version of the regulation effective after 1994. The 1989 version of the regulation provided that the present value requirement was to be used "for purposes of determining present value of any accrued benefit and for purposes of determining the amount (subject to sections 411(c)(3) and 415) of any distribution including a single sum." 26 U.S.C. § 1.417(e)-1(d) (1989). The 1994 version omitted the regulation's use of the word "purposes."[12] Plaintiff argues that had the Eighth Circuit looked to the earlier version fo the regulation, it would have correctly concluded the § 417(e)(3) rate was applicable to

_____

[12]The 1994 version read in relevant part that the statutory discount rate was to be used for "the present value of any accrued benefit and the amount...of any distribution." 26 C.F.R. § 1.417(e)-1(d)(1) (1998).

both distribution valuations and accrued benefit calculations. Instead, Plaintiff argues, the Eighth Circuit's erroneous analysis rendered an inconsistent interpretation of the regulation that narrowed the statute's scope. Plaintiff's argument lacks merit.

Section 417's pre-1994 version–discussed in detail above–makes clear that the statute contemplated situations wherein a present lump-sum would be calculated in two instances: (1) for purposes of making an immediate lump-sum distribution, and (2) to determine whether a distribution should be made in the first instance. Plaintiff fails to identify any meaningful difference between the two versions of the regulation that would lead this Court to conclude that § 417(e) applied to anything more than *distributions* pre- or post-amendment. Both the statute and regulation contemplate dual purposes, but both "purposes" are tied to distributions.

Plaintiff also cites the regulation's preamble arguing again for broadly defined "dual purposes" in using the § 417 interest rate:

> First, for purposes of determining whether a distribution may be made without obtaining applicable consents (the "threshold rule"), a participant's benefit must be valued by using an interest rate no great than the Pension Benefit Guaranty Corporation's (PBGC) interest rate for trusteed single-employer plans. Second, the actual single sum that the participant (or beneficiary) receives under the plan must be calculated using an interest rate no greater than the immediate PBGC rate (the "amount rule") for trusteed single-employer plans.

53 Fed. Reg. 31837 (Aug. 22, 1988). Plaintiff argues that one of the two purposes the preamble articulates is use of the statutory interest rate for calculating a "threshold" accrued benefit valuation. Again, Plaintiff crafts his argument absent the larger statutory context. The "threshold" determination referenced is one that must be made for purposes of assessing whether a distribution can be made in the first instance. In other words, the plan must first calculate the present value of Plaintiff's accrued benefit using the statutory

19

discount rate for purposes of determining whether consent is required for a *distribution*, not for purposes of determining a participant's opening account balance.

Plaintiff incorrectly posits that the regulation and its preamble establish that use of the PBGC interest rate was required for discounting benefits to a lump sum regardless of whether or not the benefits were immediately distributed in a lump sum. Plaintiff's reliance on both the regulation and its preamble's purported "dual purposes" is misplaced. Neither the regulation nor preamble may be interpreted absent the larger statutory framework of § 417 and its apparent reference and application to cash-outs. At the time BP converted its defined benefit plan to a cash balance plan, ERISA lacked a mandatory interest rate applicable to opening account balances upon plan conversion. As long as Plaintiff's prior accrued benefit was protected by plan terms, the BP Plan properly complied with ERISA § 204(g) regardless of how opening account balances were calculated.

### 2. Section 417 Must be Analyzed in Conjunction with Section 411

Moreover, Plaintiff fails to acknowledge that § 417 is to be read in conjunction with and subordinate to § 411, which governs minimum vesting standards. 26 U.S.C. § 411; *see Esden*, 229 F.3d at 159. Section 411(a)(11) of the statute prohibits distributions in excess of a specified amount without the consent of the participant. In other words, it delineates restrictions on certain mandatory distributions.

Treasury regulation § 1.411(a)-11 interprets IRC § 411(a)(11), and provides in relevant part:

> **(d) Distribution valuation requirements**. In determining the present value of any distribution of any accrued benefit from a defined benefit plan, the plan must take into account specified valuation rules. For this purpose, the valuation rules are the same valuation rules ***for valuing distributions*** as set

forth in section 417(e); see § 1.417(e)-(d)(1)....

26 C.F.R. § 1.411(a)-11 (1989) (emphasis added); *see also Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1244 (11th Cir. 2000).  The 1989 regulation as promulgated establishes the valuation rules set forth in § 417(e)(3) apply for purposes of lump-sum *distributions*; further support that at the time BP converted its plan from a defined benefit plan, although there were rules governing the calculation of lump-sum distributions, there were not similar rules for calculating a participant's opening account balance.

### 3. Plaintiff's Prior Accrued Benefits were not Reduced in Violation of IRC 411(d)(6) and ERISA § 204(g)

Counsel, at oral argument, asserted that ERISA § 204(g) protects previously accrued benefits from elimination or reduction at the time of both distribution of a lump sum and creation of an opening account balance.  The lack of a specific reference to opening account balances in ERISA § 204(g) or its parallel provision in IRC § 411(d)(6), counsel argued, does not permit the conclusion that ERISA's anti-cutback provision applies only to protect *distributed* benefits from impermissible reduction. The Court agrees. A violation of ERISA § 204(g) occurs *any* time previously accrued benefits are reduced or eliminated as a result of plan amendment,  regardless of distribution.  Whether ERISA 204(g) applies equally to protect previously accrued benefits at the time of distribution or creation of an opening account balance, however, is not at issue in this case.  The issue is whether an impermissible reduction of prior accrued benefits occurred when BP established Plaintiff's opening account balance at the time of conversion using an 8% discount rate.

To prevail on a § 204(g) claim a plaintiff must establish: (1) a plan amendment; and

(2) a reduction in accrued benefits. *Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1451 (7th Cir. 1986). BP's conversion to a cash balance plan qualifies as an amendment to its defined benefit plan, but what Plaintiff has failed to establish is that an impermissible reduction of accrued benefits actually occurred in setting his opening account balance. Because the BP Plan provided "[i]n no event shall the benefits payable under this Plan to a Participant who was a participant under the Prior Plan be less than the Actuarial Equivalent of the benefits such Participant would have received under the Prior Plan," Plaintiff's prior accrued benefits were protected from impermissible reduction or elimination. BP Plan § 6.8. Moreover, based on a plain reading of the statute's text, as discussed previously, use of the 8% discount rate to establish Plaintiff's opening account balance did not violate ERISA's anti-cutback provision.

### D. *Sunder* is Not Inconsistent with Sixth Circuit Precedent

Plaintiff insists the Eighth Circuit's decision in *Sunder* is inconsistent with Sixth Circuit precedent on the issue of accrued benefit valuation and further that the court erroneously relied on cases that hold wear-away permissible. In support of this argument, Plaintiff cites cases wholly inapplicable to the issue before this Court and distorts Sixth Circuit holdings to conform to his argument. Plaintiff's flawed interpretation of Sixth Circuit case law does not meaningfully distinguish *Sunder* as inapplicable to the instant action.

Plaintiff first argues the Eighth Circuit improperly relied on cases decided prior to the 2006 enactment of the PPA that held wear-away did not violate ERISA. Specifically, the Eighth Circuit relied on the Ninth Circuit's decision in *Hurlic v. Southern California Gas Company*, 539 F.3d 1024 (9th Cir. 2008), and the First Circuit's decision in *Campbell v.*

*BankBoston, N.A.*, 327 F.3d 1 (1st Cir. 2003).[13]  Plaintiff objects to the Eighth Circuit's reliance on *Hurlic* and *Campbell* because neither case involved wear-away claims where opening account balances were credited in amounts less than the present value equivalents of previously accrued benefits.  The Eighth Circuit did not cite such cases, however, because none exist.  *Sunder* is the only appellate court to address the merits of the issue before this Court.  In criticizing the Eighth Circuit's reliance on cases factually analogous–rather than factually *identical*–Plaintiff does not himself cite a Sixth Circuit case, or any other case, that deals with the propriety of wear-away as it relates to opening account balances.

Moreover, the Eighth Circuit's conclusion that its holding is bolstered by the "legality of wear-away provisions," Plaintiff argues, "is undermined by the Pension Protection Act of 2006, which amended ERISA and the IRC to prospectively ban wear away provisions." (Doc. #37, at 15-16).  This argument is unpersuasive for one obvious reason:  Plaintiff himself acknowledges the PPA *prospectively* amends ERISA.  In confirming that a total freeze on benefits was consistent with ERISA's provisions pre-2006, *Hurlic* and *Campbell* reinforce the *Sunder* court's conclusion that ERISA did not govern the setting of opening

---

[13]In *Hurlic*, the Ninth Circuit Court of Appeals affirmed the district court's dismissal of the plaintiffs' claim that the defendant plan violated ERISA's anti-backloading provisions, 29 U.S.C. § 1054(b)(1)(A)-(C), for failure to state a claim.  539 F.3d at 1035.  Plaintiffs argued that they would not accrue any additional benefits until the year in which their cash balance formula benefits exceeded their frozen pre-conversion formula benefits.  During the wear-away period, plaintiffs asserted they would accrue benefits at a rate of 0% in violation of 29 U.S.C. § 1054(b)(1)(B).  *Id.* at 1034.  In affirming the district court's dismissal, the Ninth Circuit noted the defendant plan "clearly could have" frozen all benefits and still complied with the statute.  *Id.* at 1035.

In *Campbell*, the First Circuit concluded that a corporation's conversion of its defined benefit plan to a cash balance plan that included a wear-away provision within its plan terms did not violate ERISA § 204(g) because only future expected benefits, rather than previously accrued benefits, were reduced or eliminated. 327 F.3d at 8.  The wear-away provision had the effect of freezing plaintiffs benefits, specifically providing "employees' pension entitlement [would] not grow until their pension benefits, as calculated under the new cash balance system, equal their actual benefits under the old system."  *Id.*

account balances at the time the USBP Plan converted its defined benefit plan to a cash balance plan. Reliance therefore on pre-2006 cases confirming the legality of 'wear-away' or 'wear-away provisions' prior to passage of the PPA do, in fact, reinforce the Eighth Circuit's *Sunder* decision.[14]

Plaintiff next contends the Eighth Circuit was erroneously influenced by the defendants' argument use of the § 417 rate would create a windfall to participants because their opening account balances "included...early retirement subsidies and more favorable mortality rates, that were not part of the accrued benefits under the [pre-conversion plan]." 586 F.3d at 600. Plaintiff seems particularly concerned with this argument because the BP Plan, like the USBP Plan, included early retirement subsidies in calculating participants' opening account balances. In fact, almost half of Plaintiff's opening account balance was attributable to early retirement subsidies.[15] Defendants often point out this fact to argue that rather than *decreasing* Plaintiff's accrued benefit, BP actually *enhanced* the benefit by

---

[14]Plaintiff in his Reply, and counsel again at oral argument, assert Defendants' insistence on analogizing Plaintiff's claim to that of a wear-away claim is misplaced. Interestingly enough, however, in support of his overall argument Plaintiff acknowledges in both his motion for summary judgment and his reply that there will be a period of wear-away where a participant does not accrue benefits under the new plan until the benefits exceed those accrued under the prior plan; this period is what plaintiff characterizes as an impermissible loss. (Doc. #48, at 5) ("The fact that French might subsequently accrue enough benefits [under the new plan] to make up for lost benefits does nothing to diminish the fact that his benefits were lost in the first place."); *see also* (Doc. #37, at 15) ("'wear-away' can occur when a cash balance plan credits an *opening account* in an amount that is less than the present value of the previously accrued benefits as determined under Section 417 or when a cash balance plan freezes accruals in the pre-amended plan.") (emphasis added). The Court finds it is disingenuous then for Plaintiff to re-characterize his claim as something other than an alternate form of wear-away, when he has previously argued that wear-away occurs when a cash balance plan "credits and opening account in an amount that is less than the present value of the previously accrued benefit as determined under Section 417." (Doc. #37, at 15).

[15]Plaintiff's opening account balance at the time of conversion was $44, $21 of which was attributable to early retirement subsidies. (Doc. #39, Ex. 14).
"Mr. French would have had to work for BP until age 55 in order to qualify for the early retirement subsidy, something he did not do. In other words, the BP Plan provided him with an early retirement subsidy he was not eligible for, a subsidy the Plan was not required to provide and one that Mr. French never, in fact, earned." (Doc. 39, Ex. 16, at 6)

including subsidies to which French was not yet entitled.[16]

In an attempt to undermine Defendants' argument, Plaintiff directs the Court's attention to the Sixth Circuit's decisions in *Constantino v. TRW, Inc.,* 13 F.3d 969 (6th Cir. 1994), and *Rybarczyk v. TRW, Inc.*, 235 F.3d 975 (6th Cir. 2000). Plaintiff contends that *Constantino* and *Rybarczyk* required Defendants to preserve early retirement subsidies within participants' opening account balances and further that the present value of any early retirement subsidy is also subject to the IRC's statutory discount rate. Plaintiff's reliance on *Constantino* and *Rybarczyk* is misplaced.

Both cases address the issue of whether the defendant plans' valuation of early retirement subsidies, *at the time of distribution*, resulted in an impermissible cutback under ERISA § 204(g). Nothing in either case addresses the propriety of using a discount rate greater than the statutory discount rate in § 417(e)(3) to establish participants' opening account balances after conversion. In *Constantino*, TRW amended its plan to eliminate any early retirement subsidy from final distribution where the lump sum form of payment was chosen. 13 F.3d at 973. TRW sought to apply this amendment retroactively. *Id.* The Sixth Circuit held the plan's elimination of early retirement subsidies from its calculation of lump sum benefits a violation of ERISA § 204(g) for those *retirees* that had already *qualified* for the subsidy prior to plan amendment. *Id.* at 977-78. Interestingly in its opinion, the court references the Retirement Equity Act Senate Report, which explains "the anti-cutback rule

---

[16]Counsel spent time arguing the issue related to early retirement subsidies at oral argument. Any discussion regarding early retirement subsidies, however, is tangential to the actual issue before the Court. The issue the Court needs to decide is whether Defendants were required to use a specific statutory discount rate in calculating Plaintiff's opening account balance after conversion. Whether early retirement subsides qualify as accrued benefits subject to ERISA § 204(g)'s anti-cutback rule does not inform whether ERISA mandated a discount rate for opening account balances at the time of BP's plan conversion. Moreover, whether required to–as Plaintiff argues–the fact is, Defendants included the early retirement subsidies in Plaintiff's opening account balance.

25

does not protect participants who do not qualify for a subsidy at the time of plan amendment." *Id.* at 978. The instant action is therefore factually distinguishable from *Constantino* in two significant ways: (1) French actually *received* early retirement subsidies, (2) for which he had not yet qualified. Nothing about this factual scenario intimates any reduction in prior accrued benefits, rather it supports Defendants' position that French received more than he was entitled to at the time of plan conversion.

In *Rybarczyk*, the Sixth Circuit held that use of an interest rate greater than § 417(e)'s rate to calculate the present value of a portion of early retirement benefits attributable to pre-amendment service for lump-sum distribution violated ERISA § 204(g). 235 F.3d at 985. Plaintiff argues that *Rybarczyk* stands for the proposition that early retirement subsidies attributable to pre-amendment service must be preserved for any participant who has met, or could in the future meet, the early retirement requirements. Plaintiff impermissibly broadens the reach of *Rybarczyk's* holding. That a subsidy must be preserved regardless of whether the participant reached the age requirement prior to amendment, does not permit preservation of that subsidy in the event the age requirement is actually *never* met. Plaintiff terminated his work with BP in 2007, before he qualified for early retirement. Because he never actually qualified for the subsidy, preservation of his pre-amendment service attributable to the subsidy is a moot point. Both *Constantino* and *Rybarczyk* actually undermine Plaintiff's position, and neither are inconsistent with the Eighth Circuit's holding in *Sunder*.[17]

---

[17]Citing *West v. AK Steel*, 484 F.3d 395 (6th Cir. 2007), counsel at oral argument, asserted again that *Sunder* is inconsistent with Sixth Circuit precedent. Counsel referenced *West* for the stated proposition that ERISA creates a framework of rules to which ERISA-regulated pension benefit plans must adhere. Although the Court can agree that *West* accurately interprets ERISA's provisions, the case is wholly inapplicable to deciding the precise issue before this Court.

## E.    GAO Report

Following the Eighth Circuit's decision in *Sunder*, Defendants also rely on the September 2000 GAO Report as persuasive authority that federal law, at the time BP converted its plan, did not govern the setting of opening account balances.[18]   Plaintiff disputes Defendants' reliance on the GAO report.  Specifically, Plaintiff argues the GAO's conclusion regarding opening account balances "was in the context of a discussion of the issue of wear-away in benefit accruals" and is, therefore, inapplicable, and further, because the GAO did not cite IRC § 417(e), its report cannot be construed as an "opinion on whether opening account calculations are subject to the Section 417 Interest Rate ceiling." (Doc. #43, at 8).  Plaintiff's argument is unpersuasive.

First, as previously discussed, a plan's choice to establish opening account balances using a discount rate greater than § 417(e)(3)'s discount rate does result in a period of wear-away; a point Plaintiff tacitly acknowledged in his motion for summary judgment. (Doc. #37, at 15).  Consequently, a discussion regarding wear-away of benefit accruals is applicable to the overall issue of opening account balances.  Second, contrary to signaling the irrelevance of the GAO's report to the specific issue before this Court (i.e. whether an

---

Plaintiff West filed suit claiming the underpayment of benefits after receiving a lump-sum distribution at retirement.  484 F.3d at 402.  Plaintiff believed his distribution was lower than that to which he was entitled because the defendant plan failed to use the whipsaw calculation in making his *distribution*.  The Sixth Circuit agreed.  Again, Plaintiff French directs the Court's attention to case law affirming the validity of the § 417(e)(3) rate for purposes of a distribution to argue its application in calculating opening account balances.  Consistent with the Eighth Circuit's decision in *Sunder*, this Court is not at liberty to judicially amend ERISA such that provisions clearly applicable to distributions would be similarly applicable to the establishment of opening account balances.

[18]As previously discussed, the GAO report provided in relevant part "federal law does not govern how plan sponsors set opening account balances for cash balance plans, provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer."  *Sunder*, 586 F.3d at 601.

opening account balance is subject to § 417(e)), the GAO's failure to cite § 417(e) in its discussion concerning opening account balances lends further support to Defendants' argument: calculations of opening account balances are determined apart from the valuation rules governing distributions under § 417(e)(3). The plain language of the report is explicit that federal law does not govern the setting of opening account balances. The Court finds Plaintiff's strained interpretation of the report disingenuous.

Plaintiff further argues that the level of deference awarded the GAO report in *Sunder* was in error because the GAO is not entitled to deference "in matters involving statutory interpretation." The Court acknowledges the GAO's report is not entitled to *Chevron* deference because the GAO is not an executive agency. *See Mich. Pork Producers Ass'n, Inc. v. Campaign for Family Farms*, 174 F. Supp. 2d 637, 647 n.4 (W.D. Mich. 2001). However, that an independent body examined the pertinent statutes, and concluded the plain language of ERISA and its parallel IRC provisions do not apply to opening account balances, is persuasive authority that Defendants' argument and the Eighth Circuit's ultimate holding in *Sunder* is correct.

### III. CONCLUSION

Because ERISA did not prescribe a statutory discount rate applicable to opening account balances at the time of BP's plan conversion, and BP's cash balance plan having provided all previously accrued benefits would be protected,[19] and for all the reasons set

___

[19]To support their argument that BP did not violate ERISA's anti-cutback provision in this case, Defendants erroneously rely on district court cases that hold a "greater of" formula effectively protects a participant's accrued benefit under a prior plan for purposes of ERISA § 204(g) compliance.

To preserve prior accrued benefits after conversion, plans will sometimes employ a "greater of" formula, which provides that the actuarial equivalent of the accrued benefit on or after the date of the conversion is determined as the greater of (1) the actuarial equivalent of the accrued benefit as of the date of conversion computed under the old formula or (2) the actuarial equivalent of the total accrued benefit computed under the new formula. *See* Rev. Rul. 81-12, 1981; *see also Brody v. Enhance Reinsurance Co.*

forth herein,

**IT IS ORDERED THAT**:

1.    Plaintiff's cross-motion for summary judgment as to Count I of the Complaint (Doc. #37) be, and is hereby **DENIED**;

2.    Defendants' cross-motion for summary judgment as to Count I of the Complaint (Doc. #38) be, and is hereby **GRANTED**; and

3.    The parties shall submit, **within ten (10) days of the date of entry of this Order**, joint or separate status reports setting forth their respective positions on Count II of the Complaint.

This 28th day May, 2010.



Signed By:

*David L. Bunning*

**United States District Judge**

---

*Pension Plan*, No. 00-cv-9660, 2003 WL 1213084, at *9 (S.D.N.Y. March 17, 2003) (the "greater of" method defendant plan used avoided reduction of any plan participants' accrued benefits in violation of ERISA § 204(g)); *Richards v. FleetBoston Fin. Corp.*, 427 F. Supp 2d 150, 170-71 (D. Con. 2006) (defendant plan did not violate ERISA § 203(a)–ERISA's non-forfeiture provision–when the plan used a "greater of" calculation method at the time of plan conversion).

To the extent Defendants contend that BP's plan protected Plaintiff's accrued benefit because it provided participants the "greater of" the actuarial equivalent of his accrued benefit calculated under the old formula or the new formula, their argument lacks merit. The BP Plan provided the "greater of" formula only to those participants who attained the age of 50 as of December 31, 1988. Accordingly, Defendants reliance on district court holdings that cite with approval a plan's use of the "greater of" formula as way to comply with ERISA's anti-cutback provision is inapposite as applied to Plaintiff French, who had not attained the age of 50 as of December 31, 1988, and therefore did not receive the benefit of the "greater of" formula as applied to his accrued benefit.